Ruffin, J.
Though the Court entertains but little doubt upon the question, yet, in the view taken of other points in the case, it becomes unnecessary to determine, whether relief *324 by injunction in this Court is the proper mode of redress for those citizens of a county, who allege grievances from proceedings of this kind; and, therefore, nothing more will be said on it.
It was, we think too, properly admitted at the bar, that a statute, authorising the people of a county, or town, to take stock in a rail-road, and to raise the funds to pa37 for it by taxing themselves or otherwise, is not forbidden bj7 the constitution. From time immemorial, the counties, parishes, towns, and territorial sub-divisions of the country, have been allowed in England, and, indeed, required to lay rates on thearselves for local purposes. It is most convenient, that the local establishments and police should be sustained in that manner ; and, indeed, to the interest taken in them by the inhabitants of the particular districts, and the information upon the law and public matters generally, thereby diffused through the body of the people, has been attributed by profound thinkers much of that spirit of liberty and capacity for self-government, through representatives, which has been so conspicuous in the molher country, and so eminently distinguishes the people of America. From the foundation of our government, colonial and republican, the sums necessary for local purposes have been raised by the people or authorities at home. Courthouses, prisons, bridges, poor-houses and the like, are thus-built and kept up, and the expenses of maintaining the poor, and of prosecutions, and jurors, are thus defrayed, and of late, a portion of the common school fund, and a provision for the indigent insane, are thus raised, while the highways are altogether constructed and repaired by the local labor, distributed under the orders of. the county magistrates. When, therefore, the constitution vests the legislative power in the General Assembly, it must be understood to mean that power as it had been exercised b}7 our forefathers before and after their migration to this continent. In accordance with these views,.is the case of Taylor v. The Commissioners of New Berne, 2 Jones’ Eq. 141; so that the question may be said to be settled here.
*325 The question remains, nevertheless, whether the proceedings to which the plaintiffs object in this case, are sustained' by the acts under which they took place; and that depends upon their construction.
The charter of the Western North Carolina Rail Road Company was passed the 15th of February, 1855, and incorporated a company, with a capital of six millions of dollars, if the'requisite stock should be taken, to build a road from Salisbury to' some point on the French Broad river, beyond the Blue Ridge-. By the act, the road is laid off into three sections — the first-beginning at Salisbury and running west, and it is required that one section shall be built before the others shall be begun* and that subscriptions of stock shall be made for the several sections separately ; that for the first section to be limited tó" $800,000, or, in a certain event, to $400,000 ; and the act en-t gages that for all stock thus subscribed, or which a deposit of five per cent, shall be made, a subscription shall be made ofi; behalf of the State to double the amount. Upon the completion of the first section, then, operations may be begun on the; second, and to that end, books of subscription are to be again opened, and upon a certain amount being obtained, measured; by the estimates of the cost of that section, there is the same engagement for a subscription on the part of the State; and so on for the residue of the route. Then, in the close of the act, 1855, C. 228, Pr. L. Sec. 47, there is a provision in these words: ‘‘That any county, through which the road passes, may subscribe for any such amount of the capital stock im said company, as a majority of the voters of said county may-approve; for which purpose, the court of pleas and quarter sessions of said counties, are hereby authorised-to hold anr election at the usual time and places of voting for members of the General Assembly.” Subscriptions were opened under the charter, and the sum required for the first section was subscribed, and the corresponding subscription made by the'; State, and the work was commenced. In 1856, Priv. A. ch'.-; 68, an act was passed to amend the charter, the provisions of which, material to this case, are: that the directors might- *326 open books for further subscriptions for $200,000, or $300,000, in their discretion, as an addition to the stock before subscribed for the first section, which is extended to Morganton and no further, with a like stipulation, that upon five per cent, being paid on the subscription by solvent persons, or by counties, a subscription should be made ou behalf of the State to double the amount. By the third section, the directors might also, in their discretion, open books for subscription for stock to an amount sufficient to meet one-third of the (estimated) cost of constructing a second section of the road, beginning at Morganton, and extending within ten miles of the Swanannoa tunnel, with a proviso, that the State would not be bound to take stock for this section, until the first section to Morganton should be completed. Then follows the fourth section, in these words: “ That before any proposition for subscription by counties shall be submitted to the people for their approval, provided in the charter, the county court of the county proposing to subscribe, (a majority of the acting justices being present) shalldetermine on the amount of stock to be subscribed by said county, and the manner in which the question shall be submitted to the people, the time when the vote shall be had thereon, and the person, by whom the subscription on behalf of said county, shall be made, and the court shall have power to make all such orders, rules, and regulations, for the issue and sale of the county bonds, necessary to insure the payment for tbe stock subscribed, and to lay such tax, from time to time, as may be necessary to pay the interest on said bonds, and ultimately liquidate the principal of tbe same.”
Under those acts the proceedings were had, which it is the object of this suit to restrain the defendants, the justices of Burke, from completing. Two objections are mainly urged on the part of the plaintiffs.
One is, that the county court did not, prior to ordering a vote of the people to be taken, directly “ determine” on the-amount of stock to be taken, and, therefore, that every thing, founded on the order, falls. The Court is inclined to the opinion, that such a determination must be considered as having *327 been substantially made; because, the record states that a majority of the justices wore present, and a majority of those present voted in favor of a proposition, that the county should subscribe for stock to the amount of $50,000, and after directing a popular vote on the proposition, there was a further order, that if a majority of the votes should be for subscription, “ the chairman of the county court shall make such subscripwhich shall be binding upon the county.” But the want of formality in those proceedings, if an3r, is fully supplied by tho entries at the succeeding term, nunc pro timo.
Another, and the material objection is, that there had before been a determination of the justices to subscribe for one thousand shares, or $100,000, which had been submitted to the people and lost by a large majority, and that the court and the people Avere thereby concluded, and could not after-wards make a subscription at all.
It may be as Avell to remark, in the first place, that there íb no difficulty in holding, notwithstanding the answer urges a return of the first election Avas not made, and that such a return is the only admissible evidence of the result of tiiat election, that, for tho purposes of this cause, it is to be taken, that the vote was adverse to the proposition to subscribe $100,000 tOAvards the stock. If it had not been, there can no doubt that each of the defendants Avould have taken steps to compel a return, instead of proceeding to a second proposition for a smaller subscription. A return Avas indispensable to authorise a subscription on that vote ; for Avithont it, a subscription could not be made more than upon an adverse one. But it does not folloAvfrom the Av$mt of a return, that there Avas no decision, any more than that it Avas a favorable one ; for, in either of those events, it is certain, it Avonld have been made to appear in an official form. It is taken for granted, therefore., that a majority of tho people voted against the first proposition ; and the case must depend upon the enquiry, Avhether, gfter rejecting one proposition to subscribe, another can b.a adopted. After consultation and much deliberation, the *328 Court is opinion, that it can, and the reasons for it will now be stated.
The work which the charter designed to call info existence is an extensive, costly, and important one. It, was deemed by the Legislature of such consequence to the State, as to induce that body to pledge the public faith to supply two-thirds of the capital estimated to be needed for its execution — the large sum of $4,000,000 — provided the residue could be raised by the subscriptions of individuals and counties. It is apparent, there were apprehensions as to obtaining those subscriptions; for they are to be accepted by piece-meal, and for sections of the road, and books are to be opened from time to time and for considerable periods. In such cases, persons who reside contiguous to the projected road, are looked to as the probable subscribers; because, as investments for dividends merely, stocks in railways have not proved profitable among us ; and hence, commonly, subscriptions come from those who indirectly receive advantages in the conveniences of trade, travel, and the appreciation of property, which may make a moderate outlays of capital prudent. But a supply from those sources was not reliable, or at all events, was not relied on, — for, the act takes the further step, unusual until recently', of authorizing the counties along the road to take stock. It cannot be imagined that, that was intended as a favorable financial me sure for those counties; at any rate, not directly' so; or that it was expected it would be so atan early period, though it might become so ultimately. On the contrary, it seems obvious, that the State wms calling on those counties for aid in constructing the work — one of cherished policy' to her, and of peculiar interest to those counties. They' might w'ell be supposed willing to contribute at one time, or at many times, as needful, pecuniary' assistance towards the construction of so great a highway'; which, in conjunction with similar works, was to connect the Atlantic coast of North Carolina with her western border, and, in the language of the act, effect a communication with the valley of the Mississippi. These considerations, ■which are found within the acts and in known public facts, *329 elucidate the provisions of the statutes, and aid in their construction. They leave no doubt that the Legislature was prepared to receive gladly any advances from the counties which they should voluntarily tender; and we are prepared to ex^ pect, in any enactment, on the subject, the use of such term's as would confer on the counties the powers, which the State thus apparently wishes them to exercise. Accordingly the charter uses the broadest terms, conferring the fullest, powers: “Any county may subscribe for any amount” of stock,such as a majority of the voters may approve. The authority is without restriction as to sums, or the periods of subscription, while other provisions show that no restriction was intended. Edr example, the act directs subscriptions from time to time, until the requisite capital shall be made up ; and the county subscriptions are not limited to this or that time, or this or that section of the road, more than in the amount. There is but a single restriction ; which is, that only such counties as lie on the road can subscribe. In all other respects the ability of the people, according to their own judgment, is to govern. The law does not force'them to subscribe, but allows them to take what stock they will. Why then, may not a county-make a subscription whenever it chooses and as often as it chooses? The power may, indeed, be most usefully exercised at different periods, according to emergencies. It may not feel able at one time to subscribe at all, or not more than apar-, ticular sum and become quite able to subscribe more at another. It may hang back in the hope, that individuals will take the stock, or that other means may be found for carrying out the work; and when disappointed in those expectations, the people may be Mulling to make a further subscription in order to get the early benefit of the road and put into activity the capital before invested. There may, in fine, be various considerations to induce the citizens of the county to make a subscription which they before declined, or to make additional subscriptions, when those previously made, are found insufficient to effect the end proposed. A court is not to take notice of the danger of errors of judgment in the people on those points *330 (which may, by the by, be as well on one side as the other,) nor to question the prudence of submitting them to the discretion of the county. That is a question of policy, and falls within the functions of the Legislature; our province is, simply, to ascertain the intention of the Legislature — the meaning of the law, as passed; and upon that, it is apparent, that the purposes of the Legislature required a grant of very full power, and it is certain, that the words do grant the fullest power. Why should it not be so, if the Legislature, in its wisdom, chooses to grant such a power? It works no wrong to any one; for after all, it is but a power to the people of a county to tax themselves from time to time, if they see it to be to their interest. So much 'for the provisions in the original charter.
.They, however, were found defective in some respects; particularly in not prescribing a mode of presenting the question in a precise form, and for certain sums, for the decision of the people, and also in the delay in taking the vote bi-enni.ally — at the time of voting for members of the Legislature, and in not ensuring due deliberation before a decision. To supply those defects, and for other reasons, an amendment of the charter was passed at the next session. But the amendments do not conflict with the policy, or the provisions of the charter in the point we have been discussing. They merely provide the requisite machinery for submitting the questions definitely to the public judgment at suitable times, and for having that judgment authenticated to the justices, who are to carry it out. They supply also a wholesome guard to rash popular impulses by not allowing the people to go beyond an amount prescribed by the magistrates of the county. There is nothing in the act to limit the number, or the amount of county subscriptions, before allowed, except in requiring the concurring judgment of the court and the people of the county in making them. But thei’e are in it other provisions which tend to establish the correctness of the construction already given to the charter upon this subject. The amendment authorizes an addition on to the west to the *331 first section, carrying it to Morgan ton, and new subscriptions for that, and also permits a beginning of the second section, lying beyond Morgan ton, and a separate subscription for that. Now, can it be said, that subscriptions by a county which that very act authorizes or recognizes, cannot be made for both these sections; and, if so, that the question, as to each, may not be taken separately and at different times? Besides, a county might have made a subscription under the original; and yet in the amended charter, which still authorizes county subscriptions, there is no provision, that a county, which had subscribed, should not subscribe again. It seems impossible to deny the right of such subscription, when the Legislature expresses no negative, but very plainly invites subscriptions from any quarter in which they may be had. It follows, that the court and people of the county may subscribe when, and in such amounts, as to them may seem best; and therefore, that they may at one time decline, and at another time make a subscription.
Some criticism was made at the bar on the language of the statute’s being in the singular number in speaking of any “proposition” to subscribe and of holding an “election,” as denoting that only a single proceeding was contemplated, and it was thence inferred, that a decision by the justices or the people adverse to any proposition was once for all, and conclusive. But grammatical inaccuracy cannot controla construction upon the general intent of the act, found in numerous provisions in it. Indeed, the language is well enough in the singular number, as it applies naturally to the making and deciding any particular proposition for a certain subscription, at a certain time ; for on that, there is a conclusive determination as to its being then adopted or rejected. But even if the county cannot subscribe toties quoties, it cannot be yielded, that it is not competent to make a subscription after the rejection of a previous one. Let the question be considered in reference to the action of the justices and the people respectively-The former do not act on such occasions judicially, so as to make a decision, at a particular time, a conclusive adjudica *332 tion, as if it were inter partes. They act as the authorised organs of the county on a local inaltor, as they do about the building of a bridge or the laying out a road. No one will question their power after a refusal to do either of those things, to make an order, upon reconsideration for those purposes. For the same reason, they may thus act on this matter. It is true, if they make an order for a subscription, and submit it to the people who adopt it, that cannot be retracted. The thing is done and cannot be recalled. But it is quite a different tiling, that by declining at a particular time to act, their whole power over the subject, though conferred in general terms, and for the purposes supposed to be beneficial, is exhausted. The same reasons which induced the grant of the power in the beginning, require its continuance until it be revoked by the Legislature. Surely, the justices may deliberate as to the amount proper to be subscribed, and after considering and deciding against one smn, they may fix on an another, and, if they may, the people may also. The two bodies act separately, and must unite in an affirmative measure, to give effect to it. But after disagreeing for a time, there is nothing to prevent them, like the two houses of the Legislature, from finally concurring and when they do concur affirmatively in the act which they are empowered to do, it ought to be valid.
The order refusing to dissolve the injunction is, therefore, deemed erroneous, and is reversed with costs; which will be certified to the Court of Equity.